IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 7, 2018

## STATE OF TENNESSEE v. ROBERT BURNETTE

**Appeal from the Criminal Court for Shelby County**
**No. 16-03098          Lee V. Coffee, Judge**

_____

### No. W2017-02263-CCA-R3-CD

_____

A Shelby County jury convicted the Defendant, Robert Burnette, of attempted first degree premeditated murder, employment of a firearm during the commission of a dangerous felony, and being a felon in possession of a weapon. The trial court sentenced the Defendant to life without the possibility of parole. On appeal, the Defendant claims that the trial court erred when it allowed an undisclosed and incompetent witness to testify, and that the evidence is insufficient to sustain his conviction for attempted first degree premeditated murder. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jessica L. Gillentine (on appeal), Bartlett, Tennessee; Monica A. Timmerman (at trial), Bartlett, Tennessee; Stephanie B. Kice (at trial), Memphis, Tennessee for the appellant, Robert Burnette.

Herbert H. Slattery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy M. McEndree, Assistant District Attorney General for the appellee, State of Tennessee.

### OPINION

This case arises from the Defendant approaching a home and shooting into a group of people while they stood on the home's porch and in the yard. Small children were present in the group; one adult was shot. For this offense, a Shelby County grand jury indicted the Defendant for one count of attempted first degree premeditated murder, one count of employment of a firearm during the commission of a dangerous felony, and two

counts of being a felon in possession of a weapon, one of which was dismissed.

## I. Facts

At the Defendant's trial on these charges, the parties presented the following evidence: Betty Davis[1] testified that on May 11, 2015, she was at her sister's house in Memphis, Tennessee drinking beer and whiskey. She was sitting on the porch of her sister's residence with her sister, her daughter, and two of her grandchildren, and felt as if someone was watching her. Her other grandchild was standing in the door of the residence. Betty Davis's nephew, Eddy, was in the yard playing basketball with other children. Betty Davis stated that it was night but streetlights and porch lights provided illumination to the area. The Defendant, who Betty Davis knew as "Slick" and had seen periodically in the neighborhood, approached the group. The Defendant came into the front yard and stood within five feet of the group, saying, "I know how to cap a n****r's a**." The Defendant next took out a weapon and started "throwing the bullets." Betty Davis clarified that the Defendant seemed to have the weapon tucked up under his right arm, hiding it in his armpit, as he approached. She stated that the Defendant brought the weapon out from under his arm slowly and started shooting. One of Betty Davis's grandchildren, Brittany, hit the floor. Betty Davis stated that the Defendant was trying to shoot Eddy, so she told Eddy to run away. A bullet hit the metal railing on the porch. After Eddy ran off, the Defendant left the scene. Betty Davis denied that Eddy or anyone on the porch or in the yard had a weapon. Betty Davis did not speak to the Defendant before he started shooting.

Betty Davis agreed that she identified the Defendant in a photographic lineup created by the Memphis Police Department. Betty Davis said she was scared when the Defendant started shooting towards her and her family.

On cross-examination, Betty Davis clarified that the Defendant's weapon was concealed in a paper bag as he approached the residence. She stated that he was walking "handicapped." Betty Davis's sister, who was also sitting on the porch, called out to the Defendant as he walked up, asking, "[W]here's the dope at Bro?" Betty Davis clarified that her sister and the Defendant "g[o]t high together." Betty Davis reiterated that there were "a number" of people on the porch of the residence including small children. She said that everyone was really scared.

Betty Davis clarified that, when the Defendant pulled the weapon out from under his arm, the paper bag was still on the gun, and the Defendant shot through the bag with the gun on its side. The handle of the gun was visible to Betty Davis. She heard four shots,

---

[1]Betty Davis testified that her last name "Davis" was often used interchangeably with "Davison."

and then the Defendant walked away. Betty Davis checked on the children while her sister called the police. Betty Davis gave a statement to police in which she stated that the Defendant had a .38 caliber weapon and that Eddy had been shot in the head and the back. Betty Davis and other family members found Eddy lying in a ditch near the residence and took him to the fire department.

Billie Davis testified that she was Betty Davis's daughter and that she was present at her aunt's house on the night of the shooting while her cousin Eddy played basketball in the yard with "the kids," who she said were seven and fourteen years old at the time. Billie Davis and her aunt, who was also sitting on the porch, saw the Defendant, whom she knew as "Slick," and asked him if he knew where any drugs were. The Defendant replied, "[Y]es, I know where the dope at, just like I know how to pop a n****r's a**." Then the Defendant pulled out a gun from under his arm and started shooting. No one sitting on the porch that evening had a weapon.

Billie Davis testified that she heard five or six shots and that the Defendant was standing close enough to her for her to see "fire coming from the gun." She stated that the Defendant was shooting at her cousin Eddy. Two of Billie Davis's children were on the porch with her when the shooting occurred; her other child stood in the doorway of the residence. Eddy took off running towards the back of the house; Billie Davis's aunt later found him lying in the street. Billie Davis identified the Defendant in a photographic lineup; she was absolutely sure it was the Defendant who committed the shooting.

S.B.[2] testified that she was eight years old at the time of trial. She testified that Billie Davis is her mother, Betty Davis is her grandmother, and Eddy is her cousin. She agreed that "something" happened at her aunt's house when she was sitting on the porch with her family. S.B. identified the Defendant in the courtroom and said her aunt called the Defendant over to the porch where the group sat. As the Defendant walked over, S.B. stood next to Eddy. The Defendant had a gun under his arm and started shooting towards Eddy in a "throwing" motion. Ms. Davis told Eddy to run away, and S.B. got down on the ground. S.B. recalled two or three shots being fired.

On cross-examination, S.B. agreed that she was in kindergarten at the time of the shooting and had never seen the Defendant before. She recalled that, when her aunt called the Defendant to the porch, she asked him, "[W]here the dope at?" Shortly after, S.B. heard gunshots. She agreed that she was really scared.

On redirect-examination, S.B. testified that the Defendant replied to her aunt's question about drugs by saying, "I know where the dope at and I know how to blow a

---

[2]It is the policy of this court to refer to minor witnesses by their initials.

3

n****r's a** off."

Brittany Davison testified that she is Betty Davis's grandchild and Billie Davis's child; S.B. is her younger sister. Brittany Davison stated that she was eighteen years old at the time of trial and approximately sixteen years old at the time of the shooting. She testified that she was standing inside the door of her aunt's residence when the shooting occurred. She was very scared and got down on the floor when it happened. The door was glass from top to bottom and Brittany Davison could see through it. Brittany Davison saw the shooting happen and had seen the shooter before but only knew him as "Slick." Brittany Davison identified the Defendant in the courtroom as the shooter.

M.D. testified that she was fifteen years old at the time of trial and fourteen years old at the time of the shooting. M.D. was playing basketball in the front yard of her aunt's house with her siblings and cousins; her mother, aunt, and grandmother were sitting on the porch. M.D. testified to the shooting incident consistently with the other witnesses. She stated that the Defendant aimed his gun at Eddy's head. M.D. recalled that her aunt was high on drugs when she asked the Defendant where the "dope" was. She testified that she saw the Defendant holding a gun but that it was not covered by a bag.

Eddy Davis testified that he was playing basketball with his family members at his aunt's house on the night of the shooting. Mr. Davis was standing next to the front porch with one leg propped up on the porch while the rest of the family sat on the porch. Mr. Davis saw the Defendant walking towards the house. Mr. Davis and the Defendant had been in a fight approximately two months prior during which the Defendant pushed Mr. Davis and Mr. Davis hit the Defendant, knocking him out. While the Defendant was walking up to Ms. Davis's porch, he had his hand tucked under his opposite arm. Ms. Davis asked the Defendant where the drugs were, and the Defendant responded by saying "I'm known for blowing a n****r's a** off." The Defendant then shot Mr. Davis. Mr. Davis did not speak to the Defendant as he approached the house.

Mr. Davis testified that the Defendant pointed the gun towards him and shot towards his head. Mr. Davis then turned and ran, and the Defendant shot him in the back. Mr. Davis heard three shots total; one hit his head. His aunt later found him behind her house and took him to the fire department where he was transported to a hospital. Mr. Davis later gave a statement to police in which he identified "Slick" as the man who shot him; Mr. Davis did not know the Defendant by any other name. Mr. Davis identified the Defendant in a photographic lineup as the man who shot him.

On cross-examination, Mr. Davis clarified that the first shot fired ricocheted off the railing on the porch. The second and third shot hit Mr. Davis. He estimated that the Defendant stood approximately eight feet from him when he shot Mr. Davis, and he did not

remember telling police that the distance was five feet.

Santanica Davidson testified that she owned the home where the shooting occurred. The victim, Mr. Davis, is her nephew. He had been in a fight with the Defendant sometime in the months prior to the shooting. Ms. Davidson testified to the events surrounding the shooting consistently with the other witnesses. She testified that, when she found her nephew on the ground behind her house, he had been shot in the back, and it looked as if he had been shot in the head as well. When Ms. Davidson spoke to the police following the shooting, she identified the shooter by his nickname, "Slick," and made an identification of the Defendant in a photographic lineup. She stated it took her less than a minute to identify his photograph.

On cross-examination, Ms. Davidson testified that she knew the Defendant from "getting high" with him in the past and that the Defendant was acquainted with her brother. She testified that the Defendant was standing approximately five and a half feet from the victim when he shot him.

The jury convicted the Defendant of attempted first degree premeditated murder, employment of a firearm during the commission of a dangerous felony, and being a felon in possession of a weapon. The trial court imposed a sentence of life without the possibility of parole for the attempted first degree premeditated murder conviction and consecutive ten-year sentences for the employment of a firearm during the commission of a dangerous felony conviction and for the felon in possession of a firearm conviction. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it allowed S.B. to testify because she was not named as a witness in the list provided by the State. He further contends that, as a minor, S.B. was not competent to testify. Finally, the Defendant contends that the evidence is insufficient to support his conviction for attempted first degree premeditated murder on account of there being no evidence of premeditation. The State responds that the trial court properly allowed S.B. to testify because the State fulfilled its duty to disclose witnesses by immediately informing defense counsel of S.B.'s willingness to testify and because the trial court gave defense counsel the opportunity to speak with S.B. prior to the commencement of the trial. As to the Defendant's contention that she was not competent to testify, the State contends that the trial court conducted voir dire of S.B. outside the presence of the jury and made the informed decision that she was capable of testifying. The State further responds that the evidence is sufficient to support the Defendant's conviction for attempted first degree premeditated murder.

5

## A. S.B.'s Testimony

The Defendant argues that the trial court allowed S.B. to testify in error because she was not listed as a potential witness on the charging indictment, thus prejudicing the Defendant who did not have time to prepare to cross-examine S.B. He contends that her status as a minor meant that her testimony was a sensitive matter and that the trial court's allowing defense counsel to speak with her during trial did not rectify the State's failure to disclose her name prior to trial. The State responds that the trial court did not err when it found that the State had timely disclosed S.B. as a potential witness and that the Defendant was not prejudiced by the late disclosure. The State further argues that the trial court did not err when it concluded that S.B. was competent to testify. We agree with the State.

Tennessee Code Annotated section 40-17-106 directs the State to list "the names of such witnesses as [it] intends shall be summoned in the cause" on the charging indictment. *See also* T.C.A. § 40-13-107; Tenn. R. Crim. P. 16, *Advisory Comm'n Cmts*. The purpose of this statute is to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the State's proof. This duty is merely directory, not mandatory, however, and therefore the State's failure to include a witness's name on the indictment does not automatically disqualify the witness from testifying. *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992) ("Rule 16, Tenn. R. Crim. P., does not require nor authorize pretrial discovery of the names and addresses of the State's witnesses."). In cases of nondisclosure, a defendant must demonstrate prejudice, bad faith, or undue advantage to obtain relief. *Id.* The determination of whether to allow the witness to testify is left to the sound discretion of the trial judge, which is exercised upon examination of the circumstances presented in that particular case. *State v. Underwood*, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984) (citing *McBee v. State*, 372 S.W.2d 173 (Tenn. 1963)).

It appears from the trial transcript that after the jury was empaneled, but before any evidence was presented, the State informed defense counsel that it intended to call S.B. as a witness. The Defendant objected because he was not previously aware that S.B. would be called since she was not listed on the State's list of potential witnesses. The Defendant contended that she had never been interviewed by the police and had never identified the Defendant as the shooter and thus had no probative testimony. The Defendant further objected to her testifying on the grounds of her age, contending that her young age harmed her credibility. The State conceded that S.B. was not previously listed as a witness, but the prosecutor explained that she had not spoken to S.B. or learned of her availability to testify until the day of trial.

Following further argument by both sides, the trial court stated that, although S.B.

6

was not listed on the charging indictment, the State had not learned of her involvement until the day of trial. The trial court found that the State had furnished S.B.'s name to the Defendant immediately upon learning of S.B.'s willingness to testify, and thus the trial court concluded that the State had complied with the rule governing timely disclosure of witnesses. The trial court then stated that it would conduct voir dire of S.B., outside the presence of the jury, to determine her competency to testify and understand the oath. The trial court further stated that the Defendant was not prejudiced by the State's late disclosure of S.B. as a witness and that it would allow defense counsel to meet with S.B. prior to the beginning of trial. The Defendant conceded that S.B.'s name was listed in discovery and requested an extra day to be able to interview S.B., which the trial court granted.

Following our review of the transcript, we conclude that the trial court did not abuse its discretion when it determined that the State had not failed to disclose S.B. as a witness in compliance with Rule 16 and allowed S.B. to testify. Just as the trial court stated, the State disclosed S.B.'s name as soon as it was made aware that she would be willing and able to testify. The State thus complied with the directory in Rule 16, which we reiterate is not mandatory. *See Harris*, 839 S.W.2d at 69. Furthermore, upon the Defendant's objection, the trial court allowed the Defendant extra time to meet with S.B. to give the Defendant time to prepare for cross-examination, which it judged was an appropriate remedy based on the circumstances of the late disclosure. We agree that this was the proper remedy to allow the Defendant to receive a fair trial and conclude that the trial court did not abuse its discretion.

We further conclude that the trial court did not abuse its discretion when it determined that S.B. was competent to testify. Every person is presumed competent to be a witness, including children, mentally incompetent persons, and convicted felons. Tenn. R. Evid. 601, *Advisory Comm'n Cmts*. This presumption may be rebutted, however the Defendant presented nothing to show that S.B. was not competent. The trial court questioned the victim at length about her understanding of the proceedings and her oath to ascertain whether she was competent to testify. In our view, the record shows that the victim was competent to testify. The Defendant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to sustain his conviction for attempted first degree premeditated murder because there was a lack of evidence of premeditation. The State responds that the evidence is sufficient to sustain his conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State,

"*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the

evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2014). A premeditated killing is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2014). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . ." T.C.A. § 39-12-101(a)(2) (2014).

The element of premeditation is a question of fact for the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). In *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004). The firing of multiple shots can allow a jury to infer premeditation. *State v. Halake*, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001) ("Additionally, in the instant case the victim was shot multiple times, which although not indicative of premeditation when considered by itself, can be considered as evidence of premeditation in addition to other proof of premeditation.")

We conclude that the evidence, viewed in the light most favorable to the State, was sufficient for a rational trier of fact to find the Defendant's conduct constituted a substantial step towards the premeditated and intentional killing of Mr. Davis. The evidence was that the Defendant walked up to a house where an unarmed Mr. Davis was

standing outside and, while positioned approximately five feet from Mr. Davis, fired three shots directly at him, one of which hit him in the head, another in the back. The evidence of premeditation was that the Defendant and the victim were in a fight prior to the shooting. The Defendant brought a weapon to the home where he knew the victim would be, concealed the weapon in a paper bag, walked up to where the victim was standing, made a slang reference to shooting someone, lifted his hand and fired the weapon at the victim several times. The victim was shot in the head and the back. This is sufficient evidence from which a jury could find beyond a reasonable doubt that the Defendant was guilty of attempted first degree premeditated murder. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE